# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

KELLI MURTAGH and JOHN MURTAGH,

      Plaintiffs,

v.                                    No. CIV 00-1679 BB/LFG

JEFF LANDERS and the BOARD OF COUNTY
COMMISSIONERS OF BERNALILLO COUNTY,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of a motion for summary judgment filed by Defendants (Doc.39). The Court has reviewed the submissions of the parties and the relevant law, and, for the reasons set forth below, finds that the motion will be granted in part and denied in part.

Summary judgment is appropriate only if the admissible evidence shows there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Id.* On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." *Walker v. NationsBank of Florida*, 53

F.3d 1548, 1555 (11th Cir. 1995). The Court will address the motion for summary judgment with these standards in mind.

**Brief Summary of the Facts**

Plaintiff Kelli Murtagh ("Kelli") is employed by Defendant as a firefighter and paramedic, as is Plaintiff John Murtagh ("John"), her husband. In January 1999, Kelli became pregnant. That same month, John performed a research project, investigating pregnancy and maternity leave policies in effect at other fire departments around the country. John did this at the request of Chief Vinke, the Fire Chief in charge of the Bernalillo County fire department, who made his request on the day the Murtaghs informed him of the pregnancy. John submitted the material he had obtained to Chief Vinke on or about January 21, 1999. Subsequently, on or about February 15, Kelli obtained permission from an Assistant Fire Chief to work in the atrium, as modified or light duty, due to her pregnancy. When she showed up for work at the atrium, Chief Vinke consulted with Defendant Landers, who is an Assistant County Attorney, concerning the modified duty, because he was not certain how to treat a pregnancy as opposed to a sprained ankle or some other type of injury. Following that conversation, Chief Vinke told Kelli she would have to return to the field until she provided a doctor's certification concerning what duties she could and could not perform. John intervened, and a compromise was reached under which Kelli took administrative leave until she could consult with her doctor.

Kelli's physician provided a certification to the effect that Kelli could perform all duties required of her except firefighting duties. Chief Vinke informed Kelli that she would have to return to the field, but would only be required to perform paramedic duties. The opportunities to perform solely paramedic duties were limited, however, and Kelli was assigned to the busiest fire station in Bernalillo County, ostensibly because that was the only station where she would be able to limit her

2

duties to those of a paramedic. In order to assign Kelli to Station 2, another firefighter/paramedic had to be displaced, which led to hard feelings and discomfort. In addition, since Station 2 was so busy, the other firefighters had difficulty understanding how Kelli's limited duties were to be accommodated. As a result, when Kelli showed up for work at Station 2 she was often "floated" to a different station and not allowed to work at Station 2. During one of these "floating" sessions a brush fire occurred, and Kelli was forced to choose between asserting her right to perform only paramedic duties, and assisting her fellow firefighters in suppressing the fire. She chose not to abandon her co-workers, and monitored the pumps while the fire was being fought. Kelli and John filed a number of grievances as a result of the Station 2 situation, with the result that another compromise was reached: Kelli was assigned a "ghost" position at Station 1, her duties were limited to paramedic duties, John switched his station assignment to accommodate the firefighter who had been displaced from Station 2, and Plaintiffs dropped the grievances they had filed.

The situation described above remained in effect until May 1999, when Kelli entered her fifth month of pregnancy. At that time, her physician further restricted her duties, and she was placed on modified or light duty, in the atrium. Up until this time, every firefighter/paramedic who had been placed on modified duty was allowed to work 50 hours per week.[1] When Chief Vinke asked Landers about the modified-duty hours, however, Landers told him that as long as Kelli was performing office work, she would have to be paid overtime for any hours she worked over 40 hours per week. According to Landers, this result was mandated by "recent appellate decisions." Chief Vinke disagreed with Landers, but in the end Kelli was told she could work only 40 hours per week of

---

[1]The "normal" work hours for a firefighter/paramedic on regular duty were 105 hours every two weeks; the parties agree that any hours beyond 106 hours would be overtime hours.

3

modified duty. To prevent the financial hardship this cut in hours would cause, Kelli was forced to use sick leave and annual leave.

On February 25, 2000, Kelli filed an EEOC complaint concerning her treatment at the hands of the Fire Department. After the EEOC issued a right-to-sue letter, Plaintiffs filed this lawsuit. The claims raised in the lawsuit included a Section 1983 claim for gender discrimination, a Title VII claim for gender and/or pregnancy discrimination, a Section 1983 claim for First Amendment retaliation, a claim under the New Mexico Constitution for gender discrimination, and a state-law claim for breach of contract. Plaintiffs have voluntarily dismissed their breach-of-contract claim, in their response to Defendants' motion for summary judgment. Defendants request summary judgment on all remaining claims, and dismissal of the action.[2]

---

[2]Defendants also raise several procedural objections to Plaintiffs' response to the motion for summary judgment. First, Defendants maintain the response was untimely. Defendants state that they allowed an extension until October 5 to file the response, but were not served with the response until October 9. The file date on the response, however, is October 5; therefore, the response was timely filed, even if it may not have been served on Defendants until October 9. Defendants also argue that Plaintiffs exceeded the page limits for both the brief and the exhibits. Plaintiffs did submit many pages of inadmissible or irrelevant materials, such as unsworn statements from individuals and maternity leave policies of other fire departments. The Court has ignored these materials for summary-judgment purposes. Counsel for Plaintiffs should take heed, however, that a failure to abide by page limitations could result in a decision by a court to ignore highly relevant, admissible materials, thus jeopardizing their client's case. Finally, Defendants have requested that a number of affidavits and witnesses be stricken. Some of these witnesses were allegedly not disclosed by Plaintiffs. The Court need not at this time address the issue of whether they should be stricken, as their affidavits were not deemed pertinent to the grant or denial of summary judgment. Defendants maintain other witnesses' affidavits are not based on personal knowledge. To the extent these affidavits are considered by the Court in its decision, they are based on such knowledge. For example, David Dryden's affidavit details his own experience with modified duty and the number of hours he was allowed to work. The Court is at a loss to understand how Defendants could possibly contend this affidavit is not based on personal knowledge.

**Title VII Claims Against Landers**

Defendants maintain that Kelli failed to exhaust her administrative remedies against Defendant Landers, because she did not name him in the EEOC complaint. Defendants ask that the Title VII claims be dismissed against Landers. Kelli, on the other hand, points out that she did name Landers in the affidavit accompanying that complaint. Whether or not he was properly named as a party, however, is irrelevant. The Tenth Circuit, along with virtually every other Circuit, has determined that individuals cannot be held liable in Title VII cases. Instead, only the employer may be subjected to liability under that statute. *See Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir. 1993); *see also Haynes v. Williams*, 88 F.3d 898, 900 (10th Cir. 1996) (following *Sauers*, and criticizing *Ball v. Renner*, 54 F.3d 664 (10th Cir. 1994), which had indicated that the individual-liability question was still an open one in the Tenth Circuit). Therefore, Defendants' request for summary judgment on the Title VII claims asserted against Landers will be granted.

**Title VII Claims Against Bernalillo County**

**A. Refusal to Allow Kelli to Work 50 Hours Per Week:** As noted above, Kelli's Title VII claims are based on allegations of gender discrimination and violation of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"). Claims brought under the PDA are analyzed in the same manner as other disparate-treatment claims under Title VII. *See Horizon/CMS*, 220 F.3d at 1191. Where direct evidence of intentional discrimination is lacking, a plaintiff may use the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Id.* The first step in this process requires the plaintiff to establish a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to offer a facially neutral, non-discriminatory explanation for the action it has taken. Finally, if the defendant is able to offer such an explanation,

5

the burden shifts back to the plaintiff to provide evidence indicating that the proffered explanation is a pretext for discrimination. *Horizon/CMS*.

To establish a prima facie case of gender or pregnancy-based discrimination, the plaintiff must show four things: (1) she was a member of a protected group; (2) she was qualified for the modified-duty position she sought; (3) she was denied the position; and (4) this occurred under circumstances giving rise to an inference of unlawful discrimination. *Id.,* 220 F.3d at 1192. In this case, Kelli has shown she is a woman and was pregnant in the spring of 1999, and was thus a member of two protected groups. No question has been raised about whether she was qualified to perform the duties of the modified position she sought. Furthermore, although she was not denied the modified position outright, she was not allowed to work 50 hours per week, as other firefighters/paramedics had been allowed to on all previous occasions. Kelli has therefore met the first three requirements of the prima-facie-showing test with respect to her claim that the refusal to allow her to work 50 hours per week on modified duty was a result of gender or pregnancy-based discrimination.

As to the fourth prong of the test, Kelli has presented the following evidence: (1) until her situation occurred, the standard practice in the Fire Department was to allow any firefighter/paramedic who was on modified duty to work 50 hours per week (admitted by Defendants, and supported by other evidence); (2) One firefighter/paramedic, Bruce Ferguson, who was on modified duty at the time Kelli began her modified duty, was working 50 hours per week and continued to work 50 hours per week even though Kelli was not allowed to do so (same); (3) Although Defendants claimed that they ended the practice of allowing modified-duty employees to work 50 hours per week, and that every modified-duty employee after Kelli was limited to 40 hours per week, there is evidence that this claim is wrong; for example, a lieutenant with the Fire Department, Emily Kane, testified in her deposition that a "young man" working for the Department

6

"right now" was working modified duty, "doing radios", and has worked at least 50 hours per week; she also testified that Aaron Britnell, another employee working modified duty, was not limited to 40 hours per week (Kane depo., Exh. 36, Pltf's. Resp.); in addition, David Dryden, a lieutenant with the Fire Department, submitted an affidavit stating that he broke his finger in July 2000, worked modified duty, and worked 50 hours per week (Exh. 37, Pltf's. Resp.); finally, another firefighter/paramedic, Christine Jordan, submitted an affidavit stating that she had surgery in February 2001, and was limited to 40 hours per week of modified duty (Exh. 31, Pltfs. Resp.). The foregoing evidence satisfies the fourth prong of the prima-facie-showing test, as it tends to show that only women, pregnant or not, were limited to 40 hours per week of modified duty, while men were allowed to work 50 hours even after the supposed change in policy that supposedly started with Kelli's situation.

Defendants have attempted to present a facially neutral reason for their 40-hour limitation by claiming that the limitation was the result of Chief Vinke's consultation with Landers, who apprised the Chief of "recent appellate decisions" that indicated a firefighter not performing firefighting duties would have to be paid overtime for any hour worked over 40 per week. As noted above, Defendants claimed that based on this advice the practice and policy changed, to prevent any modified-duty employee from working more than 40 hours per week. This evidence does constitute a facially-neutral explanation for Defendants' actions. However, there is ample evidence raising a question of fact as to whether this explanation is a mere pretext for discrimination. The simple facts that the policy has apparently been applied only to women, and was not even applied to a man who was on modified duty at the very same time Kelli was limited to 40 hours per week, raise an issue of fact as

to whether the explanation now provided is false.[3] *See Horizon/CMS*, 220 F.3d at 1199 (differential treatment of similarly-situated employees may support a finding of pretext). In addition, Defendant Landers testified that an employee on modified duty would not necessarily have to be limited to 40 hours per week, if the employee was involved in duties related to fire suppression. (Landers depo. pp. 75-76, Exh. 45, Pltf's. Resp.) There is no indication that modified duties fitting that requirement were not available. Therefore, there is evidence that Kelli could have been allowed to work 50 hours per week without causing an overtime problem, which was the ostensible basis for the decision to limit her to 40 hours. Clearly, an issue of fact has been raised as to whether the explanation for the 40-hour limitation was a mere pretext for discrimination. Summary judgment will be denied on this claim.

**B. Initial Refusal to Allow Kelli to Work Modified Duty:** Defendants maintain that Plaintiffs are barred from bringing this claim under Title VII, because the EEOC complaint was not filed within the applicable 300-day limitations period. Plaintiffs concede the complaint was not timely filed, since the incidents occurred in February and March 1999 and the EEOC complaint was not filed until February 25, 2000, over a year later. Plaintiffs argue, however, that the initial refusal to allow Kelli to work modified duty without a doctor's certification, and the subsequent assignment to Station 2, were part of a continuing pattern of discrimination and therefore may be included within the Title VII claim. A claim of discrimination may include instances of discrimination that occurred outside the applicable limitations period if they are part of a continuing pattern of discrimination. *See Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1415 (10th Cir. 1993). To decide whether such acts

---

[3]Defendants submitted an affidavit contending that allowing Mr. Ferguson to continue working 50 hours per week was an "oversight." A jury would be entitled to disbelieve that explanation. Furthermore, Defendants have not explained the other instances of men being allowed to work modified duty at 50 hours per week rather than 40.

8

may be considered, the Tenth Circuit has adopted a three-part test. First, the court must consider the similarity of the violations; second, the frequency; and third, the "permanence" of the violation, or whether the nature of the violations should trigger the plaintiff's awareness of the need to assert her rights. *Id.* In this case, the first claimed violations consisted of Defendants' actions in requiring Kelli to provide a doctor's certification setting out her physical limitations as a pregnant woman, refusing to simply grant her modified duty, assigning her to Station 2 in an attempt to comply with the limitations placed on her by her physician, and then "floating" her to other stations, where she ended up having to assist in fighting a fire. The Court finds these violations are not similar in nature to the refusal to allow Kelli to work 50 hours a week on modified duty. Most significantly, however, the violations not only should have triggered Plaintiffs' awareness of the need to assert Kelli's rights, but actually did so. As pointed out above, Plaintiffs filed several grievances concerning the situation, with the result that a settlement was reached under which Kelli was not assigned to Station 2, or "floated" to any other station, and was not put into a position in which she had to violate her physician's restrictions. The Court will find, therefore, that Plaintiffs were well aware of their rights and of the claimed violations, and there is not sufficient reason to excuse the untimely filing of the EEOC complaint as to the initial claimed violations. Summary judgment will be granted on the Title VII claims arising out of the incidents occurring in February and March, 1999.

**§ 1983 and State Constitution Claims**

These claims are based on the same facts described above, and allege discrimination on the basis of gender. There are two areas of concern with respect to these claims--first, whether the County can be held liable for any constitutional violation that might have occurred, and second, whether Defendant Landers may be held liable. As with the Title VII claims, there are also two

9

different sets of claimed violations, the limited-work-hours claim and the assignment-to-the-field claim.

**Claims Versus Defendant County:** Defendants maintain the County cannot be liable for any claim because there is no evidence regarding the existence of a discriminatory County policy or custom. The Court finds that even if this assertion were true, it does not matter. Proving the existence of a policy or custom is not the only means of imposing § 1983 liability on a municipality or other local government body. Such liability is also incurred if the person who made the discriminatory decision is considered the final policymaking authority with respect to that decision. *See Randle v. City of Aurora*, 69 F.3d 441, 447-48 (10th Cir. 1995); *Butcher v. City of McAlester*, 956 F.2d 973, 977 (10th Cir. 1992). Plaintiffs contend that Landers was the decision-maker in this case, and Defendants contend Chief Vinke was. Even assuming Defendants are correct, their argument as to the liability of the County fails because there is evidence that Chief Vinke was the final policymaking authority concerning personnel matters such as the modified-duty decisions made in this case.

There are three elements helpful to a determination of whether an individual is a final policymaker in a certain area: (1) whether the official is meaningfully constrained by policies not of his own making; (2) whether the official's decisions are final, meaning they are not subject to meaningful review; and (3) whether the decision made by the official is within the realm of the official's grant of authority. *Randle*, 69 F.3d at 448. Chief Vinke testified in his deposition that he made the decisions concerning Kelli's modified duty assignments, and that he had the authority to make those decisions. (Vinke depo. pp. 49, 73, 78, Exh. A, MSJ). Jeff Landers also testified at his deposition that the fire chief is the only person who places employees or approves modified duty, and that the collective bargaining agreement contains provisions "talking about modified duty at the

chief's discretion." (Landers depo. p. 36, Exh. E, MSJ). According to this evidence, therefore, Chief Vinke had the authority to make decisions concerning modified duty, solely at his discretion, unconstrained by any provisions in the collective bargaining agreement or any other employment policy. On this record there is at least a question of fact as to whether the final policymaker with respect to modified duty issues made the challenged decisions in this case. Accordingly, there is also a question of fact as to whether the County Defendant may be held liable for the actions of Chief Vinke. Summary judgment will be denied to the County on the municipal-liability issue. Since that is the only ground argued by the County in support of its motion for summary judgment on the § 1983 claim, this claim will proceed to trial against the County.[4]

**Claims Versus Defendant Landers:** The main issue argued by Defendants with respect to Landers is whether there is any evidence he had any role in the decision-making process, other than giving legal advice to Chief Vinke. Plaintiffs maintain Landers actually made the decisions concerning the initial denial of modified duty, and the subsequent limitation of her modified duty to 40 hours per

---

[4]As discussed above with respect to the Title VII claims, there is ample evidence to raise a question of fact as to the merits of the gender-discrimination claim, at least with respect to the limitation-of-hours issue. Since Defendants' Title VII arguments concerning Plaintiffs' other claims was restricted to the statute-of-limitations question, Defendants have not performed a burden-shifting analysis as to the claims concerning the initial refusal to allow modified duty, assignment to Station 2, and "floating" to other stations. *See Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir.1991) ("the elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas, whether the case is brought under section 1983 ... or Title VII."). In the absence of briefing from Defendants, the Court declines to perform such an analysis on its own initiative. Therefore, on the current state of the record, if the Court were to address the merits of the § 1983 claims against the County, summary judgment would be denied. Finally, nowhere in the briefs is there any argument concerning the state-law constitutional claim of gender discrimination. Since the state-law claim is similar, if not identical, to the federal § 1983 claims, summary judgment will be denied on those claims as well, as to the County. *Cf. Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 693, 763 P.2d 1153,1158 (1988) (Noting, in context other than employment, that "[t]he tests for reviewing equal protection challenges generally are the same under New Mexico and federal law").

11

week. The evidence they have submitted in support of this assertion, however, is slim. As discussed above, both Landers and Chief Vinke testified the decisions were made by Vinke, and were his and his alone to make. Furthermore, the job description submitted for Landers' position contains no authorization for him to make personnel decisions for County agencies. (Exh. O, MSJ). Finally, Landers testified that he had never been consulted about modified duty prior to Kelli's situation, indicating he had no involvement in modified-duty decisions prior to that time, and there is no evidence contradicting that assertion. There is also no evidence he was involved in subsequent decisions to allow 40 or 50 hours per week of modified duty. In the face of this evidence, Plaintiffs have submitted the following: (1) Kelli was told that the 40-hour limitation on her modified duty was because "Jeff Landers said so." (Kelli depo. p. 64, Exh. 22, Pltfs. Resp.); and (2) Chief Vinke testified that he disagreed with Landers, and thought the Department should be able to give modified-duty employees more hours, but despite this disagreement the 40-hour limitation was imposed.

One possible interpretation of the above evidence, of course, is that Landers gave Chief Vinke legal advice concerning overtime pay, which Vinke reluctantly followed, due to concerns about the overtime issue. The question is whether a reasonable fact-finder could infer that Landers actually made the decisions concerning Kelli's modified duty, and did so out of a discriminatory motive. Even if it might be possible to draw an inference, based on Chief Vinke's disagreement with the hours limitation, that he was overruled by Landers with respect to Kelli, there is no evidence that the decision was the result of discrimination. Landers testified that he thought firefighter/paramedics performing modified duties, not related to fire suppression, would have to be paid overtime for any hours worked over 40. There is no evidence that he was involved in any decision to allow more than 40 hours for any of the men discussed above who were apparently allowed to work 50 hours per week on modified duty. In other words, there is no evidence that Landers made any decision to treat

12

Kelli differently than male employees on modified duty, because there is no evidence he made any decision with respect to any employee other than Kelli. As far as the Court can determine from the record, Landers' position has always been consistent for any employee, male or female, pregnant or non-pregnant: a modified-duty employee must be paid overtime for any hours worked over 40. For this reason, the Court will grant summary judgment on the § 1983 and state-constitution claims as to Landers.

**First Amendment Retaliation Claim**

Plaintiffs maintain that Defendants retaliated against Kelli because John spoke out on an issue of public concern. Defendants suggest that a retaliation claim must be based on retaliation taken against the speaker, rather than the speaker's spouse. The Court need not decide that issue, because summary judgment is appropriate on this claim for other reasons.

There are two types of speech at issue in this case. The first is John's submission of materials concerning the pregnancy and maternity leave policies of fire departments in other cities. The second is his advocacy on behalf of Kelli, concerning the modified-duty issue and the initial requirement that she remain in the field. In analyzing a First Amendment retaliation claim brought by a government employee, the Court must apply a balancing test derived from *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). *See Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir. 2001). The balancing test considers four factors: (1) whether the speech in question involves a matter of public concern; (2) if so, whether the employee's interest in expression outweighs the government employer's interest in regulating that expression; (3) whether the speech was a substantial factor driving the challenged governmental action; and (4) whether the employer would have taken the same action against the employee even in the absence of the protected speech. *Id.*

13

John's submission of the pregnancy and maternity leave materials, coupled with his advocacy for the adoption of such policies in the Bernalillo County Fire Department, can be considered speech on a matter of public concern. However, there is no evidence that this speech was a substantial factor driving Defendants' initial treatment of Kelli. Chief Vinke asked John to research the issue, find out what fire departments around the country were doing, and submit the material (John depo. pp. 100-102, Exh. 35, Pltfs. Resp.). There is no indication he was upset or annoyed, or had any negative reaction at all to John's research or the materials submitted. Since the research was performed at Chief Vinke's request, there is no evidence anyone else saw the materials, and there is no evidence that the materials were controversial at all with respect to Chief Vinke, it is simply not possible to draw an inference that John's compliance with Chief Vinke's request was a substantial motivating factor behind the Chief's later actions toward Kelli.

As to John's advocacy on behalf of Kelli, including filing grievances and attending grievance hearings, the speech did not involve a matter of public concern. Speech pertaining to internal personnel disputes and working conditions ordinarily will not involve questions of public concern. *See Finn v. State of New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001). This is true even if the personnel dispute concerns a question of discrimination, which under certain circumstances could certainly be considered a matter of public concern. *See id.* (employee's allegations of disability-based discrimination were simply attempts to contest demotion and transfer, and were not matters of public concern). When John was filing grievances on behalf of Kelli and intervening on her behalf with her superiors, he was not speaking as a citizen upon matters of public concern, but as an employee on matters only of personal interest, which is speech not protected by the First Amendment. *See Connick v. Myers*, 461 U.S. 138, 147 (1983).

14

Based on the foregoing, summary judgment will be granted on the First Amendment retaliation claim.

**Conclusion**

Summary judgment will be granted as to John's retaliation claims, as to the Title VII claim against Landers, as to the Title VII claim against the County arising out of the events of February and March, 1999, and as to the § 1983 and state-constitution claims against Landers. As a result of this decision, Landers will be dismissed as a defendant. Summary judgment will be denied as to the limitation-of-hours Title VII claim, the § 1983 claim, and the state-constitution claim against the County.

**ORDER**

A Memorandum Opinion having been entered this date, it is hereby ORDERED that Defendants' motion for summary judgment (Doc. 39) be, and hereby is, GRANTED in part and DENIED in part.

Dated this 30th day of October, 2001.

                                                                BRUCE D. BLACK
                                                                United States District Judge

**ATTORNEYS**:
**For Plaintiff**:
Carolyn M. Nichols and Shannon L. Oliver
Nichols & Oliver, P.C.

**For Defendant**:
Agnes Fuentevilla Padilla
Butt, Thornton & Baehr, P.C.

15